**Well, IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**DONALD S. MCAULIFFE,**

      **Petitioner,**

v.

**UNITED STATES OF AMERICA,**

      **Respondent.**

**CASE NO. 2:08-cv-336
CRIM. NO. 2:03-cr-70
JUDGE MARBLEY
MAGISTRATE JUDGE KEMP**

## REPORT AND RECOMMENDATION

Petitioner, a federal prisoner, brings the instant motion to vacate, set aside, or correct

sentence pursuant to 28 U.S.C. §2255. This matter is before the Court on the instant petition

as supplemented, respondent's return of writ and the exhibits of the parties. For the

reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be

**DISMISSED.**

## PROCEDURAL HISTORY

The United States Court of Appeals for the Sixth Circuit summarized the facts of this

case as follows:

> On March 8, 2002, a fire destroyed the Millersport, Ohio,
> lakeside residence of defendant-appellant Don S. McAuliffe, a
> duly-elected sitting judge of the Fairfield County Municipal
> Court, Lancaster, Ohio. At the time of the fire, defendant
> wasvacationing in the Virgin Islands. Defendant twice sent
> verified proof of loss claim forms to his insurer, Grange
> Mutual Casualty Company ("Grange"), via United States mail,
> representing in the forms that "the cause and origin of the said
> loss were: UNKNOWN TO CLAIMANT." Defendant
> eventually settled his claim for $235,000. He used the insurance

proceeds to pay off the mortgage on the destroyed property and a car loan, and to make a down payment on another parcel of real estate. Federal, state, and local authorities, however, became suspicious that the fire had been purposefully set by defendant and a business partner, Darrell Faller, as part of a scheme to defraud the insurance company.

On April 23, 2003, following an investigation into the matter, a federal grand jury in the Southern District of Ohio indicted defendant on charges of mail fraud, in violation of 18 U.S.C. § 1341 (Counts One and Two); using fire to commit mail fraud, in violation of 18 U.S.C. § 844(h)(1) (Count Three); conspiring to use fire to commit mail fraud, contrary to 18 U.S.C. § 844(m) (Count Four); [FN1] and money-laundering, in violation of 18 U.S.C. § 1957 (Counts Five and Six). The indictment sought forfeiture of the insurance proceeds, as well as the real and personal property acquired with those proceeds.

FN1. Count Four inadvertently referenced 18 U.S.C. § 844(n); the district court allowed the Government to amend the indictment to substitute subsection (m) for (n).

Following a nearly three-week jury trial, defendant was convicted as charged on all counts. The district court originally sentenced defendant to 207 months of imprisonment; specifically, 60 months on Counts One and Two; 87 months on Counts Four, Five, and Six, to run concurrently to each other and to the sentences on Counts One and Two; and 120 months on Count Three, to be served consecutively. Defendant filed a timely notice of appeal and, while the appeal was pending, this court remanded for re-sentencing in light of the newly issued decision in *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). Defendant was re-sentenced to a total of 156 months of imprisonment: concurrent sentences of 36 months on Counts One, Two, Four, Five, and Six, and a consecutive sentence of 120 months on Count Three. A final order of forfeiture was entered by the court. The amended judgment of conviction and sentence was entered on December 20, 2005, the same date on which defendant filed the present appeal.[FN2]

FN2. A corrected amended judgment of conviction was later entered on January 11, 2006, modifying only the portion of the judgment pertaining to restitution. Pursuant to the amendment, defendant was ordered to pay immediately a fine of $150,000, make restitution of $235,000, and forfeit two pieces of real estate, along with a vehicle. Defendant was ordered to liquidate his accounts in order to satisfy these obligations.

***

[T]here was ample evidence on which to convict defendant. At trial, Faller testified as a witness for the government that he and defendant conspired to burn down defendant's house so that defendant could obtain the insurance proceeds and use the proceeds to demolish the house and rebuild it. They arranged for defendant to be out of town when Faller started the fire. Defendant's former girlfriend, Beth Westminster, also testified as a government witness, corroborating that Faller and defendant conspired to burn down the house with the ultimate purpose of rebuilding it. In their first attempt, defendant and Faller tried to rupture a gas line in the house; however, this attempt failed. Faller testified that he and defendant then made a second attempt to burn down the residence by placing a halogen lamp against a wall that they believed would ignite. This attempt was successful and, during the early morning hours of March 8, 2002, the house caught fire.

An insurance adjuster investigated the fire damage and observed fire damage on the lower level, but also noticed more extensive fire damage on the upper level of the home. Due to suspicions about the cause and origin of the fire, she then referred the matter to a consulting firm. Richard Marzola, an electrical engineer, took photos and collected debris from the site. He observed the burn patterns near the lamp, but also noticed a second set of burn patterns at the base of the stairs to the upper level. At his request, two experienced arson investigators were sent to the residence for further investigation. The final report issued by Marzola's firm found neither evidence of a "foreign ignitable liquid" nor "an electrical malfunction or abnormality," but concluded, based

on the two unrelated points of origination, that the "cause of this fire loss was an intentional human action." The report indicated that the burn patterns associated with the first point of origin (the lamp) on the lower level of the house indicated that the fire traveled up the wall and into the ceiling joists, but eventually self-extinguished and did not penetrate the second floor sub-floor. The patterns associated with the second point of origin (base of the stairs) indicated that the resultant fire "progressed up the stairs" and caused "extensive direct flame damage ... throughout the second floor."

Grange Insurance sent defendant a reservation-of-rights letter stating in part that the fire at defendant's Northbank Road residence "has been determined to have been deliberately set." Two days later, the claims adjuster sent defendant a claim form entitled "Property Sworn Statement in Proof of Loss." It is undisputed that defendant returned the completed and notarized form to Miller via fax, with the original being sent by United States mail. In signing the form, defendant agreed "that the loss did not occur because of any act or design on [his] part" and that "[n]othing has been done to conceal or misrepresent any material facts concerning this claim, nor to deceive the company." In response to the first question on the form, defendant replied that "the cause and origin of the said loss were: UNKNOWN TO CLAIMANT." Defendant sought $361,925 for damages to the real and personal property.

On April 9, 2002, the claims adjuster sent a letter to defendant rejecting his claim for failure to provide sufficient detail and documentation. Defendant responded by letter, disputing her assertions and requesting a new adjuster. The successor adjuster who was assigned to defendant's claim settled defendant's claim in April of 2002 for $235,000. Pursuant to this settlement, defendant again was required to submit a signed and notarized "Property Sworn Statement in Proof of Loss (Revised)," which reiterated that the origin of the fire loss was "unknown to claimant." Defendant mailed this revised form to Grange via U.S. mail. Defendant thereafter received two settlement checks from Grange-one in the amount of $95,000 for the personal property claim, and the other for $140,000 for

> the real property loss. Defendant used the proceeds to pay off his mortgage on the residence, to pay off a loan on a vehicle, and to purchase another real estate parcel.
>
> The business relationship between defendant and Faller thereafter soured, and Faller contacted an attorney, who in turn contacted an agent with the Bureau of Alcohol, Tobacco and Firearms ("ATF"). In exchange for his cooperation, Faller was granted immunity from prosecution. He described to authorities his role and defendant's involvement in the planning and execution of the fire for the purpose of obtaining insurance proceeds. Over the next two months, authorities recorded several conversations between defendant and Faller or Westminster.

*United States v. McAuliffe*, 490 F.3d 526 (6th Cir. 2007). Petitioner timely appealed his convictions and sentence to the United States Court of Appeals for the Sixth Circuit.

> In his appeal, defendant challenges the sufficiency of the evidence and alleges, *inter alia,* that defects in the indictment and improper constructive amendments to it mandate reversal of his convictions.

*See id.* On June 22, 2007, the United States Court of Appeals affirmed petitioner's convictions and sentence. *Id.* On October 15, 2007, the United States Supreme Court denied petitioner's petition for a writ of *certiorari*. *McAuliffe v. United States*, 128 S.Ct. 442 (2007).

On April 1, 2008, petitioner filed the instant *pro se* motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. §2255. He asserts the following claims:

> 1. McAuliffe's attorneys (sic) failure to inquire into and analyze the factual components of his case constituted ineffective assistance of counsel. Their failure had a substantial and injurious effect on the process.

5

2.  McAuliffe's attorneys committed numerous substantive legal errors because of their lack of analysis of McAuliffe's case.

3.  The government's acts mandates habeas corpus relief.

Petitioner has filed a supplemental memorandum in support of these claims. Doc. No. 174.

It is the position of the respondent that petitioner's claims are without merit.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner asserts the ineffective assistance of counsel.  Respondent contends that this claim is waived because petitioner failed to raise the issue on direct appeal; however, the United States Court of Appeals for the Sixth Circuit has held that claims of ineffective assistance of counsel are properly addressed in a motion under 28 U.S.C. §2255.  *See United States v. Jackson*, 181 F.3d 740, 747 (6th Cir. 1999), citing *United States v. Tucker*, 90 F.3d 1135, 1143 (6th Cir. 1996); *United States v. Seymour*, 38 F.3d 261, 263 (6th Cir. 1994). This Court therefore will address the merits of petitioner's claim of ineffective assistance of counsel.

The Sixth Amendment guarantees the right to effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970). The standard for reviewing a claim of ineffective assistance of counsel is twofold:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's

> errors were so serious as to deprive the defendant of a fair trial,
> a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir.1987). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland,* 466 U.S. at 689.

To establish prejudice, it must be shown that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id.,* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.,* at 697. Because the petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, if the Court determines that petitioner has failed to satisfy one prong, it need not consider the other. *Strickland,* 466 U.S. at 697.

Petitioner asserts that his attorneys failed properly to investigate the case. According to petitioner, fire damage to the ground floor of his house occurred long before he owned the property; however, Faller discovered the evidence of old fire damage while renovating petitioner's home, and then attempted to get petitioner to participate in Faller's scheme to set the house on fire to avoid paying back a debt he owed petitioner arising out of their business venture ("Judge-R-Work") when it turned sour. *Petition,* at 9-14. Petitioner maintains, as he did at trial, that Faller went to the authorities and falsely

accused him of these crimes after petitioner refused to participate in Faller's scheme. *Id.,* at 14-15, 19. Petitioner also argues at length that proof that the halogen lamp ignited a fire was critical in establishing his guilt, and but for his attorneys' failure to argue the halogen lamp could not have caused any fire damage to his house, he would have been exonerated. *Id.,* at 18-20.

Review of the record fails to support petitioner's argument. The record does not indicate inadequate investigation or performance by defense counsel. Petitioner's attorneys conducted extensive cross examination of the prosecution's witnesses and called numerous defense witnesses on petitioner's behalf to call into question the reliability of the government's case, including presentation of evidence that juveniles had been starting fires in the area and Faller was an untruthful and unreliable witness who had a motive to incriminate petitioner in these crimes. Counsel cross-examined prosecution witness Shane Skeen, of the Fairfield County Sheriff's Office, regarding the reliability of his opinion that the halogen lamp had caused a fire in view of the lack of fire destruction around the site of the halogen lamp and the inverted V pattern around the lamp. *Transcript,* Vol. II, at 157-162. Skeen acknowledged on cross examination that he had initially noted in his report that the cause of the fire was accidental. *Id.,* at 165-66. The fire had two points of origin, on the first floor and the second floor. *Id.,* at 164-65. Defense counsel also cross-examined the prosecution's expert witness, Richard Marzola, on his opinion that the halogen lamp had started a fire. *See Transcript*, Vol. III, at 34-92. Marzola had examined the halogen lamp that purportedly caused the fire. He "had it on for somewhere between four and six hours

and all that it did was kind of discolored" paper backing. *Id.*, at 50. "It did not actually start smoldering or have a flame." *Id.* Paper ignites at between 300 and 350 degrees; wood ignites at between 350 and 400 degrees; however, the most amount of heat he could get from the lamp was around 280 degrees. *Id.*, at 54-55. Most of the first floor had no fire damage. *Id.*, at 61. Marzola's conclusion that the fire had been intentionally set was based on his determination that the fire had two points of origin, and nothing else. *Id.*, at 67. No testing had been done to determine if any accelerants had been used to start the fire from the outside of the house. *Id.*, at 90-94. Defense expert Larry Pfeiffer "spent hours" reviewing the photographs of the house. He testified at length regarding his analysis of numerous photographs of the fire scene and his conclusions from examinations of these photographs, the house, and speaking with fire personnel who had been at the scene of the fire. *See Transcript*, Vol. X, at 70; Vols. IX, at 129-186; Vol. X, at 2-199. It was his expert opinion, "based on analyzing the fire patterns from the pictures" that the fire originated from outside of the house, on the north side. *Id.*, Vol. X, at 81-82. According to Pfeiffer, based on a reasonable degree of scientific certainty, the fire had originated neither from the halogen lamp nor the foot of the stairs. *Id.*, at 82.

In any event, as discussed in this Court's order denying petitioner's motion for judgment of acquittal, and contrary to petitioner's argument here, regardless of whether the jury believed that petitioner had no involvement in the second floor fire or that the halogen lamp started the fire, these facts would not necessarily have exonerated petitioner. Testimony by Faller and Westminster indicating that petitioner was involved in a scheme

to burn down his home to obtain insurance proceeds, evidence that the fire had been set intentionally, and other circumstantial evidence of guilt sufficiently established petitioner's guilt as an aider and abettor. As previously discussed, *see Order*, Doc. No. 70, under the Pinkerton Rule of Liability, petitioner is responsible for the reasonably foreseeable acts of a his co- conspirator:

> [t]he jury could have found that conspiring to commit arson to burn down his house and causing *some* fire damage, was a "material fact," given that the home ultimately was destroyed by fire.... [B]ased on Defendant's failure to disclose such information in the Sworn Proof of Loss forms, which he mailed to Grange, a rational trier of fact could find that Defendant used fire to commit mail fraud....
>
> Alternatively or in addition, a rational trier of fact also could have found McAuliffe guilty of using fire to commit a felony under the Pinkerton Rule of Liability, which was provided in the jury instructions. Under the Pinkerton Rule of Liability:
>
>> There are two ways that the Government can prove the Defendant guilty of this crime. The first is by convincing you that he personally committed or participated in this crime. The second is based on the legal rule that all members of a conspiracy are responsible for acts committed by the other members, as long as those acts are committed to help advance the conspiracy, and are within the reasonably foreseeable scope of the agreement. In other words, under certain circumstances, the act of one conspirator may be treated as the act of all. This means that all the conspirators may be convicted of a crime committed by only one of them, even though they did not all personally participate in that crime themselves.

Even assuming that McAuliffe did not participate directly in the fire, based upon Faller's testimony, a reasonable jury could have believed that he and Defendant engaged in a conspiracy to commit arson, in planning to burn down McAuliffe's house and obtain the insurance proceeds. It was not necessary that the jury find that McAuliffe himself set the fire, because the jury could have believed that Faller set "the fire" to "advance the conspiracy" and it was within the "Reasonably foreseeable scope of the agreement."

There was substantial circumstantial evidence from which a rationale trier of fact could have believed that Faller set the fire (i.e., the fire that caused the extensive damage to the second floor of Defendant's home). There was testimony from Faller, himself, and others that he was at the scene of the fire as the house was burning. Although Faller denied reentering the home to "finish the job," the jury was free to disbelieve his testimony on this point....

It would not have been unreasonable for the jury to conclude... that although Defendant was out of the country when the fire occurred, he was responsible for the reasonably foreseeable acts of a co-conspirator, such as Faller, and that Faller reentered the house and finished the job, even if the jury believed that the halogen lamp fire did not cause the majority of the damage to the home.

*Opinion and Order, May 24,* Doc. No. 70. Therefore, petitioner has failed to establish the ineffective assistance of counsel under the two-prong test of *Strickland.*

Petitioner asserts that he was denied the effective assistance of counsel because his attorneys failed to obtain his pre-trial release on bond at his bond reconsideration hearing.[1]

---

[1] On June 30, 2003, Attorneys Larry Thomas and Samuel Bernard Weiner replaced former counsel and filed a request for reconsideration of the pretrial detention order. *See* Doc. Nos. 12-15.

Specifically, petitioner contends that defense counsel improperly failed to contest the government's contention that Count Three of the indictment involved a crime of violence and thus warranted a presumption against his pre-trial release on bond, and failed to rebut evidence that he had admitted in a tape-recorded conversation with Faller his involvement in submitting a false insurance claim to Grange, had a contact who would murder for hire, or had physically abused Patty Wilson, his former wife, and therefore posed a potential threat to prosecution witness Beth Westminster. Petitioner also complains that his attorneys failed to call Agent David Meyers to testify he believed petitioner was innocent and "the feds [had been] duped by Faller." *Id.*, at 26-27. Petitioner further asserts that he was prejudiced by counsels' failure to obtain his pre-trial release on bond, because he thereafter was unable adequately to assist in preparing his defense while incarcerated. He complains that his corrections to transcripts of tape recorded conversations between himself, Faller and Westminster, introduced against him at trial, were ignored in the stipulated transcription of his recorded conversations, and that he was unable effectively to review color photographs provided in discovery, although his attorneys provided him with black and white copies. Finally, petitioner complains that he was unable to obtain adequate access to the law library and therefore did not learn of "jurisdictional errors" in Counts Three and Four of the Indictment, and in the forfeiture count against him. *Petition*, at 34-35.

Again, and contrary to petitioner's argument here, review of the record fails to reflect that defense counsel performed in a constitutionally inadequate manner during

petitioner's bond reconsideration hearing. Count three of the indictment charged petitioner with knowingly using fire to commit mail fraud, in violation of 18 U.S.C. §§1341; 844(h), and 2. Doc. No. 1. Such charge involves a crime of violence, as defined by 18 U.S.C. §3156(a)(4)(A), as "an offense that has an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another" warranting a presumption against petitioner's release. Further, the Court denied petitioner's pre-trial release on bond upon concluding that evidence was compelling that the safety of two government witnesses – Ms. Wesminister and Mr. Faller – may have been imperiled by petitioner's release pending trial coupled with the rebuttable presumption in favor of detention of persons accused of a crime of violence, *see Order*, August 21, 2003, Doc. No. 22, as follows:

> [T]he Court considered evidence that Defendant has threatened his close romantic friend, Beth Westminister. Ms. Westminister has agreed to testify against Defendant, and has cooperated with the government in collecting evidence against him. The Government presented a tape recording of a conversation between Defendant and Ms. Westminister in which Defendant tells her that if she ever leaves him, he will kill her. The Government also presented a letter from Defendant to Ms. Westminister in which Defendant explains that he is concerned for her physical safety because she "frustrate[s] [him] more than [she] can imagine."
>
> The Court continued the detention hearing until August 14 so Ms. Westminister could appear and testify in person about her concerns for her safety if Defendant were released pending trial. The testimony of Ms. Westminister did not quell the Court's concern about her safety. Ms. Westminister admitted that she still loves Defendant, but she nevertheless fears him

because he can easily become angered.... [T]he Court finds that Defendant's promise to kill her if she ever left him poses serious concerns now that she has agreed to testify against Defendant and has actively cooperated with the Government to collect evidence against him. Ms. Westminister also testified that Defendant had recently frightened her because he provided her name and address to another inmate so that he could contact her as a pen pal. Although this act could be viewed as an innocent attempt to establish a correspondence relationship between the inmate and Ms. Westminister, such act can also be viewed through the lens of intimidation. Indeed, Ms. Westminister could have been put on notice that Defendant was willing to provide her address to criminals with violent propensities if she crosses him.

The government also presented a tape-recorded conversation between D.J. Faller and Defendant. Faller has agreed to testify for the Government and has cooperated with the government in collecting evidence against Defendant. Faller was allegedly involved in committing the arson for which Defendant has now been indicted. The tape-recorded conversation between Faller and Defendant occurred after the alleged arson, and the two discussed the fire, although Defendant denied committing arson. During the conversation, Faller told Defendant that he was scared of him because as a judge, Defendant has enormous power and could order the sheriff to arrest Faller. Defendant responded that he, too, was scared, and that he had begun carrying a derringer on his person. Defendant told Faller that it was good that they were scared of each other. This conversation confirms that Defendant might attempt physically to injure Faller now that Faller has turned on Defendant by cooperating with the Government. Furthermore, Ms. Westminister testified that Defendant told her that he would kill or have Faller killed if he ever turned on him.

*Order*, August 21, 2003, Doc. No. 22. Therefore, the record indicates that the Court denied

petitioner's request for reconsideration of bond based on the tape recordings submitted by

the government, and the testimony of Beth Westminister – not on his purported contact

who would kill for hire or on the testimony of his ex-wife, although it is not clear how defense counsel could have further disputed such testimony. The Court acknowledged that petitioner denied being involved in the arson on the taped conversation with Faller. Additionally, the record is without support for petitioner's allegation that Agent Myers would have been helpful in obtaining petitioner's release on bond.

The record likewise reflects that petitioner has failed to establish prejudice under the second prong of *Strickland*.

> It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.
>
> ***
>
> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Strickland*, 466 U.S. at 693.

By his own account, petitioner was provided with a copy of the transcripts of the tape recorded conversations, to which he provided his notes to his attorneys regarding his "corrections." *Petition,* at 34. The Court conducted an in camera review of disputed portions of the transcripts of those tapes to make a determination of these portions of the transcripts. *See* Doc. No. 33. The record does not indicate that petitioner was prejudiced by this Court's resolution of any of the disputed portions of the transcripts of tape

recordings. *See id.* Further, the tape recordings themselves were played for the jury at trial, and the Court instructed the jury that the transcripts were only to be used as an aid. *See, infra.* Petitioner also acknowledges that his attorneys provided him with copies of the photographs being used against him. He reviewed the color photographs at trial, at which time he conveyed to his attorneys that the photographs indicated that there was no halogen lamp fire. Additionally, the Court granted petitioner's August 10, 2004, motion to use law library (prior to the date of the forfeiture of property hearing), *see* Doc. Nos. 72, 73, 78, and the record is without support for petitioner's contention that he was unable otherwise to obtain access to legal material or denied access to the law library, or that he was prejudiced thereby. For reasons discussed, *infra*, the record fails to support petitioner's claim that the indictment was inadequate or defective.

Petitioner asserts that he was denied the effective assistance of counsel because his attorneys failed to file a motion to suppress his January 17, 2003, taped conversation with Faller made during a settlement conference as inadmissible under Rule 408 of the Federal Rules of Evidence,[2] or a motion to suppress all of his recorded conversations with

---

[2] Rule 408 of the Federal Rules of Evidence provides:

Compromise and Offers to Compromise

(a) Prohibited uses.--Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction:
(1) furnishing or offering or promising to furnish--or accepting or offering or promising to accept--a valuable consideration in compromising or

government witnesses after the date that he had secured counsel to represent him in any inquiry of the alleged arson of his home. *Id*., at 30-37.

However, the United States Court of Appeals for the Sixth Circuit rejected petitioner's claim that his recorded conversations were inadmissible on the basis that he was represented by Attorney J. Tullis Rogers at that time:

> Defendant next maintains that certain recorded conversations between himself, Faller, and Westminster violated his Sixth Amendment right to counsel because at the time the conversations were recorded, the government's investigation had shifted purportedly from investigation to accusation, and the lawyer, Tully Rogers, whom defendant had already retained to represent him in his insurance dealings with Grange after the possibility of arson was raised, was not notified. Rogers had been retained by defendant months before any secret tapes were made. Defendant asserts that the trial testimony reflected the widespread knowledge of the government's witnesses that Rogers represented defendant in the arson-related matter with his insurer. No evidence was presented that Rogers consented to the secret taping which was

---

attempting to compromise the claim; and

(2) conduct or statements made in compromise negotiations regarding the claim, except when offered in a criminal case and the negotiations related to a claim by a public office or agency in the exercise of regulatory, investigative, or enforcement authority.

(b) Permitted uses.--This rule does not require exclusion if the evidence is offered for purposes not prohibited by subdivision (a). Examples of permissible purposes include proving a witness's bias or prejudice; negating a contention of undue delay; and proving an effort to obstruct a criminal investigation or prosecution.

done without defendant's knowledge. Defendant argues, therefore, that all evidence garnered from these taped conversations must be suppressed.

\*\*\*

As this court has explained in *United States v. Cope,* 312 F.3d 757, 772 (6th Cir.2002):

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Statements elicited in violation of one's Sixth Amendment right to counsel must be suppressed. *Massiah v. United States,* 377 U.S. 201, 207, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). But "[t]he Sixth Amendment right [to counsel] ... is offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings-whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (internal quotation marks omitted).

"Once the Sixth Amendment right attaches, any governmental attempt to elicit information from the accused without the defendant's lawyer present, even through means that may be permissible under the Fifth Amendment right to counsel prior to the point at which the Sixth Amendment right to counsel attaches (e.g., electronic monitoring of a suspect's conversations with others), is prohibited." *Mitzel v. Tate,* 267 F.3d 524, 532 (6th Cir.2001) (citing *Michigan v. Jackson,* 475 U.S. 625, 632, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986)).

Here, the last recording occurred one month before defendant was indicted, at a time when the government's investigation was still ongoing and he was a suspect, not yet an "accused." Moreover, as noted above in *Cope,* the Sixth Amendment right

> to counsel is offense-specific. Defendant's relationship with attorney Rogers was limited to his ongoing civil insurance-related dispute with Grange and was unrelated to the criminal charges that were eventually filed against him. Defendant's argument is therefore without merit.

*United States v. McAuliffe, supra*, 490 F.3d at 539-540.

Although the Sixth Circuit reviewed the claim for plain error only due to petitioner's failure to file a motion to suppress, the Court of Appeals nonetheless concluded that the claim lacked merit. Therefore, petitioner cannot establish that he was prejudiced by counsel's failure to raise such argument in a pre-trial motion to suppress evidence under *Strickland.*

Petitioner also asserts that his taped statements made to Faller on January 17, 2003, were inadmissible under Rule 408 of the Federal Rules of Evidence, because he made those statements at the Fairfield County Common Pleas Court after appearing to have his deposition taken in connection with his civil lawsuit against Faller, and because his statements were made in connection with his settlement negotiations in the civil case. *Petition*, at 36-37. This argument likewise fails.

Federal Rule of Evidence 408 provides:

> Compromise and Offers to Compromise
>
> (a) Prohibited uses.--Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction:

19

(1) furnishing or offering or promising to furnish--or accepting or offering or promising to accept--a valuable consideration in compromising or attempting to compromise the claim; and

(2) conduct or statements made in compromise negotiations regarding the claim, except when offered in a criminal case and the negotiations related to a claim by a public office or agency in the exercise of regulatory, investigative, or enforcement authority.

(b) Permitted uses.--This rule does not require exclusion if the evidence is offered for purposes not prohibited by subdivision (a). Examples of permissible purposes include proving a witness's bias or prejudice; negating a contention of undue delay; and proving an effort to obstruct a criminal investigation or prosecution.

The United States Court of Appeals for the Sixth Circuit has held that Rule 408 does not apply in the context of criminal cases:

The Second Circuit reached the conclusion that Rule 408 does not apply to criminal cases by looking to the plain language of the Rule. *See United States v. Baker,* 926 F.2d 179, 180 (2d Cir.1991) (finding it "fairly evident that the Rule applies only to civil litigation"). In reviewing the plain language, the court held that words such as "validity" and "claim" establish that the drafters of the Rule intended for it to apply solely in a civil context. *See id.* Furthermore, the Second Circuit has held that the primary policy consideration that underlies the purpose of Rule 408, which is to encourage the settlement of civil cases, does not apply to criminal prosecutions. *See Manko v. United States,* 87 F.3d 50, 54 (2d Cir.1996); *United States v. Gonzalez,* 748 F.2d 74, 78 (2d Cir.1984); *see also United States v. Peed,* 714 F.2d 7, 10 (4th Cir.1983) (holding that Rule 408 was inapplicable in the context of a criminal case because the negotiations at issue "were not negotiations aimed at settling a civil claim, negotiations that the policy behind Rule 408 seeks to

encourage").

Similarly, the Seventh Circuit held that the plain language of Rule 408 reflects that it applies only to civil cases, "specifically the language concerning validity and amount of a claim." *United States v. Prewitt,* 34 F.3d 436, 439 (7th Cir.1994). In addition, the court recognized that nothing in Rule 408 particularly circumscribes the use of evidence of settlement negotiations with a private party in the context of a criminal case. *See id.* Finding that the public interest in the prosecution of crime is greater than the public interest in the settlement of civil disputes, the court made clear that the law in the Seventh Circuit provides that Rule 408 should not be applied to criminal cases. See id.

We find that the cases that exist in the Second and Seventh Circuits are correct in concluding that the plain language of Rule 408 makes it inapplicable in the criminal context. Although this conclusion arguably may have a chilling effect on administrative or civil settlement negotiations in cases where parallel civil and criminal proceedings are possible, we find that this risk is heavily outweighed by the public interest in prosecuting criminal matters. Based upon the foregoing, we conclude... that Rule 408 does not serve to prohibit the use of evidence from settlement negotiations in a criminal case.

*United States v. Logan*, 250 F.3d 350, 366-67 (6th Cir. 2001); *but see United States v. Skeddle*, 176 F.R.D. 254, 256 (N.D. Ohio 1997), citing *Ecklund v. United States*, 159 F.2d 81, 84 (6th Cir. 1947)(reaching opposite conclusion).

In any event, although petitioner disputes the government's interpretation of his remarks to Faller,[3] the government introduced the tape as evidence indicating petitioner's

---

[3] Petitioner states that the tape reflects him telling Faller that he could pay off, not back, the hospital claim owed by Faller. *Petition,* at 25. Petitioner testified in this

knowledge of, participation in, and attempt to avoid prosecution for his illegal acts. Faller told petitioner, prior to obtaining the recording of the conversation at issue, that he had a tape revealing petitioner discussing their scheme to set the house on fire to bait him into making incriminating statements while working for government agents and wearing a hidden recording device. *Transcript*, Vol. IV, at 47-49. Petitioner and Faller left the settlement conference to speak privately when petitioner made the statements at issue. *Id.*, at 52. Even assuming that petitioner's conversation with Faller thereby did not fall outside the scope of the settlement conference, the conversation at issue involved his alleged attempt to prevent Faller from exposing his involvement in the illegal scheme to burn down his house for insurance proceeds, or to prevent his criminal investigation and prosecution for such illegal act, and therefore fell outside the scope of evidence prohibited under Rule 408.[4]

_____

regard that when Faller first approached him with the idea of burning down his house for the insurance proceeds, he did not immediately reject the idea, but told Faller he would "think about it" and get back to him after discussing it with his then girlfriend, Beth Westminster. *Transcript,* Vol. XI, at 108. Although petitioner maintains that he thereafter "uncategorically rejected" Faller's offer to burn down the house and had absolutely no participation in the crimes charged, *see id.*, at 111-188, he feared Faller may have had a tape of his initial conversation in which he did not immediately reject the idea, or that Faller may have altered such a tape, and that publicity of its release would ruin his political career. *Id.*, at 165-167. According to petitioner, any statements he made to Faller which may have appeared to have been incriminating were said in such context, and made in regard to settling his civil case. He maintains that Faller was attempting to extort him to avoid civil liability. *Id.*, at 165-176.

[4] For example, the record reflects the following exchange between Faller and petitioner on January 17, 2003:

FALLER: I don't want them guys to know, me and you broke the law

together.

MCAULIFFE: As far as I'm concerned, in this discussion there's no breaking the law.

FALLER: Okay....

MCAULIFFE: Let ... me say this. That if... we did break the law and you, your conversation with Mike O'Reilley alleging that we broke the law, number one, puts him in a real tough situation...

An attorney has an obligation to turn in if he finds out that a crime was committed. What we did, was not only not making allegations as far as arson, but you, uh, shit, you were using that as an excuse to not pay on this loan and that's extortion.

\*\*\*

D.J., what I'm more afraid of, than criminal charges is if this comes out its going to hurt me politically.

FALLER: That's just like me, too, I'm going to prison too.

*Transcript, January 17, 2003, Government's Exhibit 11b*, at 6-8.

FALLER: I made tapes of, just like down there in the house, before the fire, I made a tape for, just because I didn't trust you. And I'm willing to.... If... you pull that restraining order from me... I'm willing to give you that tape....

MCAULIFFE: You keep the tape.

\*\*\*

MCAULIFFE: ... But I'm... saying, if you ever use the tape....

\*\*\*

This is what I'm willing to do. If you want, I am willing to resign. I'll pay off, I can still pay off the claim and I'll take my punishment. And just

Additionally, the government did not introduce petitioner's statements to establish his liability for or the invalidity or amount of his civil claim against Faller. *See* Rule 408(a). Therefore, the record does not reflect that a motion to suppress petitioner's statements under Rule 408 would have been successful. *See* Rule 408(b).

> [C]ourts have held that Rule 408 is ... inapplicable when the claim is based upon some wrong that was committed in the course of the settlement discussions... wrongful acts are not shielded because they took place during compromise negotiations.
>
> 23 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure: Evidence § 5314 (1st ed. 1980) (emphasis added) (footnotes omitted). The inapplicability of Rule 408 to suits seeking to vindicate wrongs committed during settlement discussions derives from the more general principle that "Rule 408 only bars the use of compromise evidence to prove the validity or invalidity of the claim that was the subject of the compromise, not some other claim." *Id.* at n. 25. Evidence of the compromise of a claim different than the claim currently in dispute therefore is admissible unless "the compromise evidence require[s] an inference as to the offeror's belief concerning the validity or invalidity of the compromised claim." *See id.* at § 5308.

---

resign and I'll still have plenty of money.

FALLER: I know you would.

MCAULIFFE: So, what I'm sayin' is, its not something I want, but something I can do.

\*\*\*

MCAULIFFE: We never did anything. Let's just leave it at that.

*Id.*, at 11-12.

*Uforma/Shelby Business Forms, Inc. v. N.L.R.B.*, 111 F.3d 1284, 1293-94 (6th Cir. 1997). Petitioner thus has failed to establish that the ineffective assistance of counsel based upon his attorney's failure to file a motion to suppress his tape recorded statements.

Petitioner next asserts that his convictions must be reversed because he was not present at a pre-trial conference on stipulations of the accuracy of the transcripts of his tape recorded conversations with Faller and Westminster, and thus denied his right to be present during a critical stage of the proceedings. This claim should have been raised on direct appeal, but was not. Therefore, petitioner must establish cause and actual prejudice prior to consideration of his claim in these habeas corpus proceedings. *Napier v. United States*, 159 U.S. 956, 961 (6th Cir. 1998), citing *United States v. Frady*, 456 U.S. 152, 167-68 (1982).

The Court presumes that petitioner asserts the ineffective assistance of counsel as cause for his procedural default. In a related claim, petitioner asserts that he was denied the effective assistance of counsel because his attorneys failed to object to his absence at a pre-trial conference regarding stipulations of the accuracy of the transcripts of his tape recorded conversations. *Petition,* at 41-42. The Court will review these claims together. The record reflects that petitioner has failed to establish either cause for his procedural default or that he was denied the effective assistance of counsel because his attorneys did not object to his absence at a pre-trial stipulation conference on the contents of the transcripts of his conversations with government witnesses.

The Sixth Amendment guarantees a criminal defendant the right to be present and confront the witnesses against him at trial. *See United States v. Gagnon*, 470 U.S. 522, 526 (1985); *Faretta v. California*, 422 U.S. 806, 819 n.15 (1975); *see also United States v. Burke*, 345 F.3d 415, 425-26 (6th Cir. 2003). However, "the Supreme Court has repeatedly explained that "[t]he right to confrontation is basically a trial right." *Id.*, citing *Barber v. Page*, 390 U.S. 719, 725, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); *Pennsylvania v. Ritchie,* 480 U.S. 39, 52-53 1987) (plurality opinion); *California v. Green*, 399 U.S. 149, 157 (1970).

> The other constitutional foundation of the right of defendant to be present is the Fifth Amendment Due Process clause, and the Supreme Court has held that this clause guarantees "that a defendant be allowed to be present 'to the extent that a fair and just hearing would be thwarted by his absence [.]' " *Kentucky v. Stincer,* 482 U.S. 730, 745, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987) (quoting *Snyder v. Massachusetts,* 291 U.S. 97, 108, 54 S.Ct. 330, 78 L.Ed. 674 (1934)); *see also id.* at 745-46, 107 S.Ct. 2658 (holding that due process guarantees were not violated where a defendant was excluded from a witness competency hearing, and noting that the hearing did not concern the witnesses' substantive testimony); *Gagnon,* 470 U.S. at 526, 105 S.Ct. 1482 ("[W]e have recognized that [the] right [to be present] is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him."); *United States v. Brown,* 571 F.2d 980, 986 (6th Cir.1978) ("The Constitution only grants to the criminal defendant the 'right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings[.]' " (quoting *Faretta v. California,* 422 U.S. 806, 819 n. 15, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975))).

*United States v. Burke, supra*, 345 F.3d at 426 (concluding it would be questionable whether the defendant's "right to a fair and just hearing would have been thwarted even had he been entirely excluded from his suppression hearing"), citing *Yates v. United States,* 418 F.2d

1228, 1229 (6th Cir.1969). Such are not the circumstances here. Additionally, denial of the right to confrontation is subject to harmless error analysis. *Hicks v. Straub*, 239 F.Supp.2d 697, 709 (E.D. Michigan 2009), citing *Delaware v. VanArsdall*, 475 U.S. 673 (1986).

The pre-trial conference referred to by petitioner did not constitute a critical phase of his trial proceedings such that his presence was constitutionally mandated or reversal of his convictions required in these proceedings. *See e.g., United States v. Burke, supra; United States v. Brown*, 571 F.3d 980, 986 (6th Cir. 1978)(defendant's presence not constitutionally mandated at in-chambers conference concerning dismissal of juror); *United States v. Davis*, 809 F.2d 1194, 1200-1201 (6th Cir. 1987)(defendant's presence not required at jury exclusion hearing on alleged racial motivation behind government's exclusion of blacks from the jury).

Petitioner refers to *Mitchell v. Mason*, 325 F.3d 732 (6th Cir. 2003), in support of his claim. *See Traverse*. In that case, the United States Court of Appeals for the Sixth Circuit reversed the defendant's convictions without a showing of prejudice under *United States v. Cronic*, 466 U.S. 648 (1984),[5] concluding that the defendant had been denied the right to

---

[5] The Court explained:

[T]he Supreme Court [has] defined the differences between claims governed by *Strickland* and claims governed by *Cronic*. If a claim is governed by *Strickland,* a defendant must typically demonstrate that specific errors made by trial counsel affected the ability of the defendant to receive a fair trial. If a claim is governed by *Cronic,* however, the defendant need not demonstrate any prejudice resulting from the lack of effective counsel; in some cases, the Sixth Amendment violations are "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Cronic,* 466 U.S. at 658, 104 S.Ct. 2039. Three

counsel during the critical pre-trial stage of the proceedings, where defense counsel met with the defendant only six minutes during the seven month period preceding trial, had been suspended from the practice of law one month prior to trial, and the trial court ignored the defendant's repeated requests for an attorney who would assist him in preparing a defense to the charges of first degree murder. *Mitchell v. Mason, supra,* 325 F.3d at 741-42. Such are not the circumstances here.

Further, nothing in the record indicates that petitioner was prejudiced by his absence from the pre-trial conference regarding stipulations on his tape recorded conversations with government witnesses. He does not allege that he was not represented by counsel at the pre-trial conference. As previously discussed, the parties submitted disputed portions of the transcript of the tape recorded statements for the Court's *in camera* review. *See* Doc. No. 33. Further, petitioner has not referred to, and this Court is unable to locate in the record, any specific portions of the tape by which he was prejudiced from counsel's stipulations as to the accuracy of the transcripts of tape recordings. Moreover,

---

types of cases warrant *Cronic's* presumption-of-prejudice analysis. The first is the complete denial of counsel, in which "the accused is denied the presence of counsel at 'a critical stage.' " *Bell,* 122 S.Ct. at 1851 (quoting *Cronic,* 466 U.S. at 659, 104 S.Ct. 2039). The second is when counsel " 'entirely fails to subject the prosecution's case to meaningful adversarial testing.' " *Id.* (quoting *Cronic,* 466 U.S. at 659, 104 S.Ct. 2039). The third is when counsel is placed in circumstances in which competent counsel very likely could not render assistance. *Id.*

*Mitchell v. Mason, supra,* 325 F.3d at 741-42, citing *Bell v. Cone,* 535 U.S. 685 (2002). Despite petitioner's arguments to the contrary, nothing in the record reflects that the *Cronic* standard of presumed prejudice is applicable in this case.

the tape recordings were played for the jury, *see Transcript,* Vol. IV, at 53-68; Vol. V, at 105-118, and the Court instructed the jury on both occasions that the transcripts of the tape recordings were to be used solely as an aid in listening:

> Ladies and gentlemen... you are going to get a tape. As I instruct all jurors, and this is no exception, you are to be guided by what you hear. The transcript [of the tape] is only to aid you. If what you hear differs from what you see on the transcript, then you are to abide by what you have heard.

*Transcript*, Vol. IV, at 53-54; Vol. V, at 90-91. The Court similarly instructed the jury at the close of the case. *Id.,* Vol. XIII, at 162. In view of the foregoing, petitioner has failed to establish the ineffective assistance of counsel on this basis.

Petitioner asserts that his trial commenced 27 days after the speedy trial deadline had expired, and that he was denied the effective assistance of counsel because his attorneys failed to file a motion to dismiss his case as in violation of the Speedy Trial Act. *Petition,* at 49-51. This claim is plainly without merit.

18 U.S.C. § 3161(c)(1) provides:

> In any case in which a plea of not guilty is entered, the trial of a defendant charged in an information of indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs. If a defendant consents in writing to be tried before a magistrate judge on a complaint, the trial shall commence within seventy days from the date of such consent.

18 U.S.C. § 3162 provides the penalties for a violation of § 3161(c)(1), as follows:

If a defendant is not brought to trial within the time limit required by section 3161(c) as extended by section 3161(h), the information or indictment shall be dismissed on motion of the defendant. The defendant shall have the burden of proof supporting such motion, but the Government shall have the burden of going forward with the evidence in connection with any exclusion of time under subparagraph 3161(h)(3). In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice. Failure of the defendant to move for dismissal prior to trial or entry of a plea of guilty or nolo contendere shall constitute a waiver of the right to dismissal under this section.

Here, the indictment was filed on April 24, 2003, and trial initially scheduled for June 23, 2003. Doc. Nos. 1, 8. The Court granted petitioner three motions to continue the trial date, *see* Doc. Nos. 9, 11, 16, 25, 30, 31, and trial ultimately began on January 24, 2004. Doc. No. 44. Therefore, the delay in bringing petitioner to trial was attributable to the defendant and is excluded from the Speedy Trial Act. *See* 18 U.S.C. 3161(h)(1)(D); *White v. United States*, 2008 WL 4745884 (N.D. Ohio October 24, 2008)(the delay in trial caused by the defendant's request for continuance is excluded from the speedy trial clock)(citations omitted).

Petitioner asserts that his attorneys failed to raise an issue regarding a defective indictment. *Id.*, at 45-50. He alleges that all counts against him were legally defective and unconstitutional. Petitioner again argues, as he did on direct appeal, that the offenses charged constituted a violation of state law only under *Jones v. United States*, 529 U.S. 848 (2000), in view of the lack of effect on interstate commerce, and that 18 U.S.C. 844(h) was

applied unconstitutionally to charge him with a federal offense. Petitioner additionally asserts that Counts One and Two of the indictment failed to allege that he made any "material misrepresentation"; that the "scheme to defraud" could not be proven; that the indictment failed to allege the burning of his house to collect the insurance proceeds as an overt act, which was an essential component of the charge; and that the government improperly added the mens rea standard of "knowingly" in place of the greater standard of "maliciously" to Counts Three and Four of the indictment. Finally, petitioner asserts that Counts Five and Six of the indictment charged him with activities unrelated to interstate commerce. Petitioner contends that his attorneys' failure to recognize the foregoing errors was the result of incompetence and ignorance and constituted ineffective assistance of counsel. *Petition*, at 49-50.

However, contrary to petitioner's argument here, *see Traverse*, at 19, the United States Court of Appeals for the Sixth Circuit rejected these arguments on direct appeal:

> We review the sufficiency of an indictment de novo. An indictment is generally sufficient if it "fully, directly, and expressly ... set[s] forth all the elements necessary to constitute the offense intended to be punished." *United States v. Douglas,* 398 F.3d 407, 411 (6th Cir.2005) (internal citation and quotation marks omitted). In particular, the indictment must: (1) "set out all of the elements of the charge[d] offense and must give notice to the defendant of the charges he faces[,]" and (2) "be sufficiently specific to enable the defendant to plead double jeopardy in a subsequent proceeding, if charged with the same crime based on the same facts." *Id.* at 413 (internal citation omitted). "An indictment will usually be sufficient if it states the offense using the words of the statute itself, as long as the statute fully and unambiguously states all the elements of the offense." *United States v. Superior Growers Supply, Inc.,* 982 F.2d

173, 176 (6th Cir.1992). However, the recitation of statutory language " 'must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description with which he is charged.' " *Id.* (quoting *Hamling v. United States,* 418 U.S. 87, 117-18, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974)).

The indictment must be read as a whole, accepting the factual allegations as true, and construing those allegations in a practical sense with all the necessary implications. *United States v. Reed,* 77 F.3d 139, 140 n. 1 (6th Cir.1996) (en banc). An indictment is to be construed liberally in favor of its sufficiency. *United States v. Davis,* 306 F.3d 398, 411 (6th Cir.2002).

The defendant contends that Counts One and Two of the indictment, which allege violations of the mail fraud statute, 18 U.S.C. § 1341, do not adequately set forth two of the requisite elements of that offense: (1) that defendant acted willfully with an intent to defraud, and (2) that a "material" misrepresentation was made.

The mail fraud statute prohibits the use of the mails by any person "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises...." 18 U.S.C. § 1341. "Mail fraud consists of (1) a scheme or artifice to defraud; (2) use of mails in furtherance of the scheme; and (3) intent to deprive the victim of money or property." *United States v. Turner,* 465 F.3d 667, 680 (6th Cir.2006). Materiality of falsehood is a requisite element of mail fraud. *Neder v. United States,* 527 U.S. 1, 25, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). The misrepresentation "must have the purpose of inducing the victim of the fraud to part with the property or undertake some action that he would not otherwise do absent the misrepresentation or omission." *United States v. Daniel,* 329 F.3d 480, 487 (6th Cir.2003). A misrepresentation "is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decision-making body to which it was addressed." *Neder,* 527 U.S. at 16, 119 S.Ct. 1827 (internal citation and quotation marks

omitted).

The requisite intent to defraud requires "an intent to deceive or cheat for the purpose of either causing a financial loss to another or bringing about a financial gain to oneself." Sixth Circuit Pattern Jury Instruction 10.01(2)(E); *see also United States v. Frost,* 125 F.3d 346, 371 (6th Cir.1997). With regard to both elements at issue, an indictment is not fatally insufficient for its failure to allege these elements *in haec verba,* if the facts alleged in the indictment warrant the inference of such elements, i.e., materiality and intent to defraud. *United States v. McGough,* 510 F.2d 598, 602 (5th Cir.1975) (materiality); *United States v. Hoag,* 823 F.2d 1123, 1126 (7th Cir.1987) (intent to defraud).

In this case, the indictment more than adequately alleges the elements of materiality and intent to defraud. Paragraph 1 of the indictment includes in the allegations the statutory language of § 1341. Paragraph 5 of the indictment alleges that defendant "falsely represented to Grange Insurance Company that the fire damage to the dwelling [at issue] and its contents was not caused by design or procurement on his part, though he then well knew otherwise." Paragraphs 6 and 7 similarly allege that defendant submitted two sworn proof of loss statements which "falsely represented" that the March 8, 2002, fire damage to the residence "had not been designed or procured by him ... though he then well knew that his acts in planning and causing the fire damage eliminated his right to payment under the insurance policy." Certainly these allegations, that defendant's representation that the cause of the fire damage was unknown to him, related to a matter that had a "tendency" to influence Grange's decision to settle his claim. The indictment alleges that defendant made these misrepresentations "well knowing" that his role in the scheme barred his right to recover the insurance proceeds.

In addressing a similar claim involving the analogous bank fraud statute, [FN3] 18 U.S.C. § 1344, the Second Circuit Court of Appeals, in *United States v. Klein,* 476 F.3d 111 (2d Cir.2007), recently held:

FN3. The bank, mail, and wire fraud statutes all employ identical "scheme to defraud" language and thus are to be

interpreted *in pari materia. United States v. Stavroulakis,* 952 F.2d 686, 694 (2d Cir.1992); *United States v. Oren,* 893 F.2d 1057, 1060 n. 1 (9th Cir.1990).

It is true that a bank fraud conviction requires a showing that the fraudulent conduct was material, *Neder v. United States,* 527 U.S. 1, 25, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), although the bank fraud statute does not contain that actual word. 18 U.S.C. § 1344. In *Neder,* the Supreme Court held that materiality was an element of bank fraud because the word fraud incorporated fraud's "well-settled meaning at common law"-a "misrepresentation or concealment of *material* fact." *Id.* at 22, 119 S.Ct. 1827. Appellant claims, therefore, that the indictment is insufficient because it does not explicitly use the word "material." Appellant did not raise this issue in the district court, and thus we review only for plain error. *United States v. Acosta,* 470 F.3d 132, 135 (2d Cir.2006) (per curiam).

There was no error. If materiality can be inferred to be an element of criminal fraud because of the well-understood meaning of "fraud" as a legal term, an allegation of materiality can be inferred from use of the word fraud in the indictment. Moreover, as commonly understood among both lawyers and laypersons, "fraud" refers to conduct or speech intended to mislead the putative victim into parting with money or property. *See United States v. Resendiz-Ponce,* --- U.S. ----, 127 S.Ct. 782, 784, 166 L.Ed.2d 591 (2007) (agreeing with the Government that "the indictment at bar implicitly alleged that respondent engaged in the necessary overt act simply by alleging that he attempted to enter the United States," because "[n]ot only does the word 'attempt' as used in common parlance connote action rather than mere intent, but more importantly, as used in the law for centuries, it encompasses both the overt act and intent elements" of the crime of attempted illegal reentry (internal quotation marks omitted)). The materiality of the misleading conduct or speech is therefore at the heart of the word "fraud." Conduct or speech that is immaterial-irrelevant-to a putative victim cannot be fraud. Finally, each of the counts on which appellant was convicted contained an allegation that he obtained money or credit "by means of false or fraudulent ... representations."

Again, one cannot fraudulently induce a victim to part with money or credit "by means of" immaterial representations.

*Klein,* 476 F.3d at 113-14.

Contrary to defendant's argument, a reading of the indictment as a whole supports the government's position that Counts One and Two adequately aver the requisite elements of the offense of mail fraud. Moreover, defendant has not shown that the alleged deficiencies affected his substantial rights or the fairness, integrity, or public reputation of these proceedings, as required by a plain error analysis. *Cotton,* 535 U.S. at 631-32, 122 S.Ct. 1781.

Defendant next alleges that the indictment misidentified "Grange Insurance Company" as the victim of his scheme, rather than the properly titled "Grange Mutual Casualty Company." This argument is without merit-generally, the identity of the victim of a fraudulent scheme is not an essential element that the government is required to prove, *United States v. Otto,* 850 F.2d 323, 326 (7th Cir.1988); *United States v. Trapilo,* 130 F.3d 547, 552 (2d Cir.1997), and, in any event, defendant has shown neither that he was prejudiced as a result of the error in the description nor that he lacked notice as a result of the claimed mistake. Indeed, in his written communications with his insurer, he referred to the company as either "Grange" or "Grange Insurance."

Defendant further claims that Count Three, which alleges a violation of 18 U.S.C. § 844(h)(1), does not charge him with an offense cognizable under federal law. Defendant complains that certain language in Count Three, stating that defendant "damaged" or "destroyed" his home "by means of fire," contains terminology that also appears in 18 U.S.C. § 844(i), the arson statute which was not the basis for the indictment. Defendant in essence argues that the indictment blurs the requisite elements of the crime with which he was charged and "[b]eing convicted for committing and conspiring to commit a hybrid law (a bit of § 844(h) and a bit of § 844(i)) not created by Congress is a plain error that 'seriously affects the fairness, integrity, or public reputation.' "

McAuliffe's argument is indeed without merit, as the government argues. Section 844(h)(1) makes it a crime to "use[ ] fire or an explosive to commit any felony which may be prosecuted in a court of the United States[.]" Count Three of the indictment alleges that on or about March 8, 2002, defendant "knowingly used fire to commit mail fraud, as more fully set forth in Counts One and Two, incorporated herein by reference, in violation of 18 U.S.C. § 1341, a felony prosecutable in a court of the United States. In violation of 18 U.S.C. § 844(h) and § 2." These allegations mirror the statutory text and are sufficiently accompanied by such facts and circumstances as will inform the accused of the specific offense, coming under the general description with which he is charged. The mere fact that some of the operative terms of § 844(i) appear in the indictment does not diminish the fact that Count Three sufficiently alleges a violation of § 844(h).

Defendant also maintains that the jury instructions constructively amended the indictment and therefore require reversal of his convictions. Specifically, he complains that, although Counts One and Two of the indictment "correctly" charged him with "devis[ing] a scheme and artifice to defraud, *and* for obtaining money and property by means of false and fraudulent pretenses, representations and promises," (emphasis added), the jury instructions improperly substituted the disjunctive " *or*" for the italicized " *and*." Defendant contends that this had the effect of broadening the bases for conviction beyond what the grand jury had alleged, in violation of his Fifth Amendment rights.

"A constructive amendment to the indictment occurs when 'the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of an offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment.' " *United States v. Manning,* 142 F.3d 336, 339 (6th Cir.1998) (quoting *United States v. Hathaway,* 798 F.2d 902, 910 (6th Cir.1986)). A defendant bears the burden of proof on this issue. *United States v. Rashid,* 274 F.3d 407, 414 (6th Cir.2001).

"A constructive amendment to the indictment constitutes a per se violation of the fifth amendment's grand jury clause." *United States v. Syme,* 276 F.3d 131, 148 (3d Cir.2002) (internal quotation omitted).

Title 18 U.S.C. § 1341, however, uses the disjunctive "or," not "and" ("Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises...."). "It is settled law that an offense may be charged conjunctively in an indictment where a statute denounces the offense disjunctively. Upon the trial, the government may prove and the trial judge may instruct in the disjunctive form used in the statute." *United States v. Murph,* 707 F.2d 895, 896 (6th Cir.1983) (internal citation omitted). A constructive amendment claim has thus been rejected in the present context. *See United States v. Stone,* 954 F.2d 1187, 1192 (6th Cir.1992) (involving similar language in bank fraud statute, 18 U.S.C. §1344). Thus, defendant's contention in this regard is without merit, as are his remaining claims pertaining to alleged constructive amendments to the indictment.

Defendant next challenges his convictions and sentences stemming from Counts Three and Four of the indictment. 18 U.S.C. § 844(h)(1) provides that "[w]hoever ... uses fire or an explosive to commit any felony which may be prosecuted in a court of the United States" shall "in addition to the punishment provided for such felony, be sentenced to imprisonment for 10 years." Subsection (m) covers *conspiracy* to commit an offense under subsection (h). As previously noted, the indictment charged defendant with the underlying offense of using fire to commit mail fraud in violation of 18 U.S.C. § 1341. Defendant contends that, pursuant to §§ 844(h) and (m), the requirement that "fire" be "used to commit" mail fraud was not met because if he committed mail fraud, he did so by using the mails, not by "using" fire.

McAuliffe's interpretation of the statute, however, has been considered and rejected by several courts. In *United States v. Ruiz,* 105 F.3d 1492 (1st Cir.1997), the First Circuit Court of

Appeals rejected this construction of the statute urged by the present defendant and by the defendants therein. Construing the word "use" in accord with its ordinary or natural meaning, the court noted that "use" generally means "[t]o convert to one's service," "to employ," "to avail oneself of," and "to carry out a purpose or action by means of." 105 F.3d at 1503 (internal citations and quotation marks omitted). The *Ruiz* court opined:

We think it plain that the defendants "used" fire to commit mail fraud within the meaning of § 844(h)(1). The defendants set fire to Brothers Fashions "to carry out" their scheme to deceive the insurance company into making payment for claimed losses. Specifically, the fire constituted "the means" by which the defendants attempted to create the appearance of a legitimate loss of insured items. While the defendants also "used" the mails in furtherance of the scheme to defraud, that does not diminish the fact that, additionally, they "employed" or "availed themselves of" fire to effect their scheme. Finally, the defendants make no argument that the placement and purpose of the word "use" in its statutory context undermine the applicability of § 844(h)(1) here. *See Bailey* [*v. United States*], 516 U.S. [137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995)] at [143] (considering disputed language in the context of overall statutory scheme). No basis for such an argument is apparent.

105 F.3d at 1503-04 (internal citation and footnotes omitted). *See also United States v. Zendeli,* 180 F.3d 879, 885 (7th Cir.1999) ("As the First Circuit held in [*Ruiz*], a defendant uses fire to commit mail fraud under § 844(h) when he initiates a fire as part of a scheme to deceive an insurance company into making payments for claimed losses. Under such circumstances, fire constitutes the means by which the individual attempts to create the appearance of legitimate loss of an insured item.") (internal citation omitted).

The Eighth Circuit Court of Appeals recently endorsed this position as well, favorably citing *Ruiz* in a decision upholding a § 844(h)(1) conviction arising from a fire-related insurance fraud scheme involving the mails. *See United States v. Ihmoud,* 454 F.3d 887, 890-91 (8th Cir.2006).

We agree with our sister circuits' reasonable interpretation of the statute and add that such a construction of the statute is consistent with the legislative history of § 844(h), which indicates that "fire" was added to this statute (originally, only "an explosive" was designated) in 1982, because it was recognized that fire is commonly and extensively used not only for extortion, but for insurance fraud as well. Anti-Arson Act of 1982, Pub.L. No. 97-298, 96 Stat. 1319; *see* H.R. Rep. 678, 97th Cong., 2d Sess., *reprinted in* 1982 U.S.C.C.A.N. 2631, 2632 (1982).[FN4] Thus, § 844(h)(1) creates a federal offense with an enhanced penalty for persons who commit crimes "that do not require but may involve the use of fire." *United States v. Patel,* 370 F.3d 108, 117 (1st Cir.2004). Defendant's argument is without merit.

FN4. "We are mindful of the limited utility and reliability of legislative history. In this regard, 'the authoritative statement is the statutory text, not the legislative history or any other extrinsic material.' *Exxon Mobil Corp. v. Allapattah Servs., Inc.,* 545 U.S. 546, 568, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005)." *City of Cookeville v. Upper Cumberland Elec. Membership Corp.,* 484 F.3d 380, n. 6 (6th Cir.2007).

In an argument raised for the first time on appeal, defendant argues that because 18 U.S.C. §§ 844(h) and (m) do not bear a sufficient nexus to interstate commerce, these provisions are not a valid exercise of Congress's commerce clause power. Consequently, he contends, they are unconstitutional in light of *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), because these subsections "have nothing to do with 'commerce' or any sort of economic enterprise" and contain "no jurisdictional element which would ensure ... that the [alleged illegal act] in question affects interstate commerce." *Lopez,* 514 U.S. at 561, 115 S.Ct. 1624.

Although this court has not addressed this specific issue, in *United States v. Creech,* 408 F.3d 264 (5th Cir.2005), the Fifth Circuit Court of Appeals expressly rejected the argument now made by defendant:

First, Creech raises a Commerce Clause challenge to 18 U.S.C.

§ 844(h), which provides an additional penalty for anyone who "uses fire ... to commit any felony which may be prosecuted in a court of the United States." He essentially argues that because the statute does not require a jurisdictional nexus with interstate commerce to be proved in court, it does not come under Congress's authority to regulate interstate commerce. Because Creech did not raise this challenge below, we review for plain error. *See Johnson v. United States,* 520 U.S. 461, 467-68, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997).

Creech's argument fails because § 844(h)'s jurisdictional nexus is derived from the underlying felony, which must be one that "may be prosecuted in a court of the United States." By definition, then, a violation of § 844(h) must necessarily be based on an underlying crime that is properly within federal jurisdiction. *Cf. United States v. Pappadopoulos,* 64 F.3d 522, 528 (9th Cir.1995) (finding that "Section 844(h) does not facially exceed Congress's commerce power because it requires that the underlying felony itself be one that can be prosecuted 'in a court of the United States.' "). Indeed, we have previously found a very similar statute, 18 U.S.C. § 924(c), "a valid exercise of Congress' commerce power, even though no specific nexus with interstate commerce is required for conviction." *United States v. Owens,* 996 F.2d 59, 61 (5th Cir.1993).

Here, the underlying felony crime was mail fraud in violation of 18 U.S.C. § 1341. Creech does not contend that § 1341 is an invalid exercise of Congress's Commerce Clause power. Consequently, we find that Creech's indictment and conviction under § 844(h) was not unconstitutional.

408 F.3d at 267 (footnote omitted).

Here, as in *Creech,* mail fraud, the underlying offense, is not challenged by defendant as violative of the Commerce Clause. We thus adopt the sound rationale of the court in *Creech* and, applying it to the present circumstances, conclude that defendant's Commerce Clause challenge cannot prevail.

In a related argument pertaining to the validity of his convictions under §§ 844(h) and (m), defendant notes that,

pursuant to *Jones v. United States,* 529 U.S. 848, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000), the arson of an owner-occupied private residence not used for any commercial purpose is not subject to prosecution under the arson statute, 18 U.S.C. § 844(i). Defendant maintains that the government circumvented this proscription, which would apply to the present circumstances involving a private residence, by charging defendant under § 844(h) but, in reality, trying the case as if it were an arson, not mail fraud, prosecution. Defendant also cites the *Ihmoud* court's reference to § 844(h)(1) as a provision involving " *arson* in furtherance of mail fraud," rather than the use of fire to commit mail fraud, *Ihmoud,* 454 F.3d at 892 (emphasis added), as reinforcement for his claim that he was effectively but improperly convicted of arson, not mail fraud.

Defendant's reliance upon the *Jones* and *Ihmoud* decisions is misplaced. Unlike defendant, who could not be and was not in fact prosecuted for arson because his conduct in burning his own noncommercial residential home does not fall within the ambit of the arson statute, 18 U.S.C. § 844(i), as interpreted in *Jones,* the defendant in *Ihmoud* actually was charged with and convicted on charges of arson, conspiracy to commit arson, and the use of fire to commit mail fraud for his actions in setting fire to several commercial establishments to which the arson statute applies. *Ihmoud,* 454 F.3d at 888, 895. Moreover, the *Ihmoud* court's reference to "arson in furtherance of mail fraud" was made in the context of addressing the defendants' challenge to the district court's jury instructions using such language and its alleged failure to specify in the instructions that the underlying felony necessary to support a § 844(h) offense was mail fraud, not arson. The *Ihmoud* court noted that "[t]o the extent that there is ambiguity in the instructions, it is harmless. The evidence at trial overwhelmingly demonstrates that the purpose of the fire was to commit mail fraud by fraudulently collecting insurance payments." *Id.* at 893. Here, defendant's effort to characterize his convictions pursuant to Counts Three and Four as convictions for arson, rather than using fire to commit mail fraud, is unpersuasive, and plain error is not evident.

*United States v. McAuliffe, supra*, 490 F.3d at 530-537. Therefore, petitioner has failed

to establish that he was denied the effective assistance of counsel based upon his attorneys' failure to object to the indictment as defective.

Petitioner asserts that his attorneys improperly failed to request jury instructions advising the jury that it must presume that the fire was not intentionally set and of the binding effect of alleged exculpatory admissions of the prosecutor in opening and closing argument. Petitioner contends that issuance of the foregoing jury instructions would have required his acquittal. *Petition*, at 51.

Specifically, petitioner argues that the prosecutor's opening statement remark, "this is not an arson case," and his closing statement remark that there had been no direct evidence linking petitioner, Faller or Westminster to the fire, and that the government had not proven the source of the fire or who had started the fire, constituted binding admissions establishing petitioner's innocence. *Petition*, at 52-53. This argument is not persuasive.

> Though case law on the issue is scarce, the principle that an admission of counsel during trial "may dispense with proof of facts for which witnesses would otherwise be called" has been recognized by the Supreme Court since 1880. *Oscanyan v. Arms Co.*, 103 U.S. 261, 263, 26 L.Ed. 539 (1880). A court's power to act "upon facts conceded by counsel is as plain as its power to act upon the evidence produced." *Id.* However, only statements that are "clearly established" by counsel will be treated as judicial admissions. *Id.* Consistent with the principle in *Oscanyan,* the Fourth Circuit has stated that, "a clear and unambiguous admission of fact made by a party's attorney in an opening statement in a civil or criminal case is binding upon the party." *U.S. v. Blood,* 806 F.2d 1218, 1221 (4th Cir.1986). *Accord, Martinez v. Bally's Louisiana, Inc.,* 244 F.3d 474 (5th

Cir.2001); *MacDonald v. General Motors Corp.*, 110 F.3d 337 (6th Cir.1997); *U.S. v. McKeon*, 738 F.2d 26 (2nd Cir.1984); *Glick v. White Motor Co.*, 458 F.2d 1287 (3rd Cir.1972). Of course, what a court can consider a judicial admission "is restricted to unequivocal statements as to matters of fact which otherwise would require evidentiary proof; it does not extend to counsel's statement of his conception of the legal theory of a case." 30A Wright & Graham, Federal Practice & Procedure § 7026 (2000). Thus the crucial question is: Was counsel's opening statement a forecast of the evidence or a judicial admission?

*Hall v. Wal-Mart Stores, East, LP*, 447 F.Supp.2d 604, 608-609 (W.D. Va. 2006).

[J]udicial admissions generally arise only from deliberate voluntarily waivers that expressly concede ... an alleged fact.... [C]onsiderations of fairness and the policy of encouraging judicial admissions require that trial judges be given broad discretion to relieve parties from the consequences of judicial admissions in appropriate cases.

*MacDonald v. General Motors Corporation*, 110 F.3d 337, 340-341 (6th Cir. 1997), citing

*United States v. Belculfine*, 527 F.2d 941, 944 (1st Cir.1975). Judicial admissions do not

include an attorney's statements regarding opinions and legal conclusions. *Id.*, at 341,

citing *New Amsterdam Cas. Co. v. Waller*, 323 F.2d 20, 24 (4th Cir.1963); *Glick v. White*

*Motor Co.*, 458 F.2d 1287, 1291 (3d Cir.1972). This Court is unable to locate in the record

any statements by the prosecutor constituting admissions of petitioner's innocence in

this case. Further, the record reflects that the Court properly instructed the jury on all

of the elements of the crimes charged. *Transcript*, Vol. XIII, at 153-162. The Court

likewise instructed the jury on the burden of proof, and petitioner's presumption of

innocence. *Id.*, at 134-136. The record does not indicate that defense counsel failed to

request any additional jury instructions that would have exonerated petitioner.

## JURY TAMPERING, PROSECUTORIAL MISCONDUCT and
## INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner alleges that, after he was convicted, Glenn Hartle told him that one of the jurors in this case advised Hartle that an ATF agent had told a juror "it would be a miscarriage of justice if [petitioner] 'beat' the case because he... hired a better expert" to testify on his behalf. *Petition*, at 56. Petitioner states that he advised his attorneys about the incident prior to sentencing, and asserts that he was denied the effective assistance of counsel because his attorneys failed to raise the issue at sentencing. Petitioner contends that, based upon the foregoing allegations, he is entitled to a hearing under *Remmer v. United States*, 347 U.S. 227 (1954).

Petitioner's claim that he was entitled to a *Remmer* hearing should have been raised on direct appeal, but was not. Again, therefore, petitioner must establish cause and prejudice prior to consideration of such claim in these proceedings. *See Napier v. United States, supra; United States v. Frady, supra.* Petitioner has failed to establish cause and prejudice for his failure to raise this claim on direct appeal, or that he was denied the effective assistance of counsel based upon his attorneys' failure to raise the issue at sentencing.

> In *Remmer,* the Supreme Court held that a trial court, when confronted with an allegation of "any private communication, contact, or tampering, directly or indirectly, with a juror during trial," must hold a hearing to

determine the circumstances, the impact of the contact upon the juror, and whether or not the contact was prejudicial. *Remmer*, 347 U.S. at 229. The Sixth Circuit has held that a *Remmer* hearing is required "in all cases involving an unauthorized communication with a juror or the jury from an outside source that presents a likelihood of affecting the verdict." *United States v. Rigsby,* 45 F.3d 120, 123 (6th Cir.1995). A *Remmer* hearing is not warranted every time a juror suggests that the jury heard impermissible extraneous information during deliberations. *Gonzales,* 227 F.3d at 527. Rather, a hearing is required only when there is a colorable claim of extraneous information that presents a likelihood of affecting the verdict. *Id.*

\*\*\*

At the *Remmer* hearing, the defendant must show that an unauthorized contact created actual juror bias, and courts may not presume that a contact was prejudicial. *Id.; United States v. Branham,* 97 F.3d 835, 855 (6th Cir.1996)("The burden rests on the defendants to demonstrate that the alleged juror misconduct prejudiced their defense, and under no circumstance will prejudice be presumed.").

*United States v. Blackwell*, 2005 WL 3440880 (6th Cir. December 14, 2005). However, "not every allegation of unauthorized communication with a juror requires a hearing" under *Remmer. Mays v. Chandler*, 2007 WL 2903212 (E.D. KY. September 28, 2007), citing *White v. Smith*, 984 F.2d 163, 166 (6th Cir. 1993); *United States v. Walker*, 160 F.3d 1078, 1083 (6th Cir. 1998); *United States v. Frost*, 125 F.3d 346, 377 (6th Cir. 1997); *United States v. Rigsby*, 45 F.3d 120, 123-124 (6th Cir. 1995). The right to a *Remmer* hearing arises only "in response to a 'colorable claim' or '[w]hen there is a credible allegation of extraneous influences." *Id.*, citing *United States v. Davis*, 177 F.3d 552, 557 (6th Cir. 1999), United

*States v. Rigsby, supra,* 45 F.3d at 124-125. Petitioner has failed to meet this standard here. His allegation of outside influence on the jury is entirely without record support. Therefore, he has failed to establish either the ineffective assistance of counsel for failing to raise such issue before the District Court.

Petitioner generally asserts that the charges against him were the result of vindictive or improper prosecution. These allegations are without support. He further contends that the Court lacked jurisdiction to sentence him because the crimes charged were properly considered under state law, or otherwise defective, and because the prosecutor violated *Brady v. Maryland*, 373 U.S. 83 (1963). *Petition,* at 60-62. These allegations likewise are without support. As discussed, the United States Court of Appeals for the Sixth Circuit has rejected petitioner's argument that the indictment was invalid or constitutionally defective, and that the crimes failed properly to constitute a federal charge. Further, the record does not reflect a violation of *Brady.*

In regard to his claim under *Brady*, petitioner asserts that the prosecutor improperly failed to provide in discovery a taped conversation between prosecution witness D.J. Faller and defense witness Ray Holman, used in an attempt to impeach Holman at trial. *Petition*, at 63. The prosecutor did not reveal the tape until Holmon testified at trial. Petitioner contends that this tape could have been used to cross examine Faller, and showed that Faller was improperly attempting to influence Holman's testimony and therefore should have been disclosed to the defense. *Id.*, at 65-66. He further asserts that he was denied the effective assistance of counsel because his

attorneys failed to review unplayed portions of Holman's recorded conversation during trial. *Id.*, at 67. However, nothing in the record reflects either that the tape recorded conversation contained exculpatory information such that petitioner was prejudiced by his attorneys' failure to use the tape, or that defense counsel's decision not to use the tape was unreasonable under the circumstances.

In *Brady v. Maryland, supra,* the United States Supreme Court held that

> the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

*Brady v. Maryland, supra*, 373 U.S. at 86. "Impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule." *O'Guinn v. Dutton,* 88 F.3d 1409, 1418 (6 Cir.1996), citing *United States v. Bagley,* 473 U.S. 667, 682 (1985).

Evidence is material

> [i]f there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

*Id.*

> [T]here is never a real "*Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.

*Strickler v. Greene,* 527 U.S. 263, 281 (1999). Petitioner has failed to meet this standard

here.

Defense witness Ray Holmon testified that he met Don McAuliffe through D.J. Faller. *Transcript,* Vol. IX, at 37. McAuliffe gave Holmon permission to fish at his property any time he liked. *Id.,* at 38. The day before the fire, while fishing, Holmon told Faller to be sure to turn off the lights in the house because they could get really hot. *Id.,* at 44. Faller replied, the "judge has got good insurance... We'll let it burn." *Id.,* at 45. The next morning, Faller called Holmon to tell him the house had burned down. *Id.,* at 47. Holmon saw petitioner at the house when he returned to see what had happened, with tears running down his cheek. *Id.,* at 52. Holmon said that Faller did not have a good reputation for truthfulness. *Id.,* at 54.[6] The prosecutor attempted to impeach Holmon with prior statements, but Holmon denied making any of the statements referred to by the prosecutor. *Id.,* at 66-67. When the prosecutor played what purported to be a taped conversation between Faller and Holmon in an attempt to discredit Holmon, Holmon denied it was his voice on the tape or that he had ever had such a conversation. *Id.,* at 68-69. When the tape recording was introduced, defense counsel stated, "If we are going to hear a tape, let's hear it all."

> [Prosecutor]: You can play it all. I am cross examining, so
> I am going to play my part.

*Id.,* at 68. Thereafter, the following exchange took place outside of the presence of

---

[6] Other witnesses corroborated this point.

hearing of the jury:

> [Defense counsel]: We would like to know whether we can hear the whole tape.

> COURT: I don't know the purpose. This witness had denied the portions of the tape that were played were not him. Now if it's your theory that he comes in at a later time, fine.

> ***

> Since he testified it is not him on the tape, what is the point of hearing the tape?

> MR. WEINER: You are right.

> COURT: Unless you are going to press him and insist that's him on the tape. Are you going to do that?

> MR. WEINER: I don't think.

> COURT: You can impeach your witness under the new rules.

> MR. WEINER: I don't think I will do that. We just wanted to hear the tape.

> COURT: You all can listen to the tape over lunch and whatever, but I don't see a basis for listening to this tape when the witness has specifically denied that it's him on the tape.

*Id.*, at 71. Therefore, counsels' decision not to review or use the tape, since Holmon had

denied being involved in the conversation contained therein, appears to have been a

strategic decision that was not unreasonable under the circumstances. Additionally, as

discussed, this Court is unable to locate in the record any indication that petitioner was

prejudiced by counsel's decision.

> [T]he defendant must show that counsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of performance is highly deferential, and "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. Therefore, this court should judge whether, in light of all the circumstances viewed at the time of counsel's conduct, counsel's "acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. 2052. Furthermore, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91, 104 S.Ct. 2052; *see also Meeks v. Bergen,* 749 F.2d 322, 328 (6th Cir.1984). Finally, when analyzing an attorney's performance, "[i]t will generally be appropriate for a reviewing court to assess counsel's overall performance throughout the case in order to determine whether the 'identified acts or omissions' overcome the presumption that counsel rendered reasonable professional assistance." *Kimmelman v. Morrison,* 477 U.S. 365, 386, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) (quoting *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052).

*Combs v. Coyle,* 205 F.3d 269, 278 (6th Cir. 2000).

For all the foregoing reasons, the Magistrate Judge **RECOMMENDS** that this

action be **DISMISSED.**

If any party objects to this *Report and Recommendation,* that party may, within ten (10) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation* de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981).

/s/ Terence P. Kemp
United States Magistrate Judge